Case number 174207, Thermo Credit LLC v. DCA Services Incorporated, oral argument not to exceed 15 minutes per side, Ms. Brown for the appellant. Good morning your honors, may it please the court. My name is Sarah Brown and I along with co-counsel Mark Moore and David Beck are here today on behalf of Thermo Credit LLC who is the plaintiff below. I would like to reserve three minutes for rebuttal. At the center of this case is a debtor known as COI. Thermo Credit, my client, was its secured lender. DCA Services was its management company. And what we're here today to talk about is $1.6 million that COI transferred to DCA while it was insolvent. In exchange, COI received services that were worth less than $850,000. And so Thermo Credit sued to recover the difference between the value of the transfers and the value of the services under the Ohio Uniform Fraudulent Transfer Act. I have an overarching question under that act. It specifies this act like its predecessor and the Statute of 13 Elizabeth declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims. If you have a statute that is geared toward the protection of unsecured creditors and says so specifically, why would a secured creditor have a right to avail itself of that remedy? I think there are a couple points. First is that that's not a requirement under the Uniform Fraudulent Transfer Act. But I think more importantly is that for my clients, they were undersecured. And so they were not fully secured and the transfers that we are seeking to recover were not encumbered by the lien once they were in the hands of DCA. What do you say they were undersecured? They were undersecured because the value of the debts that DCA owed were less than the amount of the collateral that was in the hands of... Well, didn't they have a security interest in all of the assets of the debtor? That's correct, Judge Bush. They would have been secured to the extent it was possible for anyone to be secured, correct? Correct. But they were still undersecured in terms of the amount of their loans. But under the bankruptcy law, they would be considered and treated as a secured creditor. Of course, yes. So I guess that gets back to the basic concept. Why would you be able to avail yourself of a Fraudulent Transfers Act that is intended to assure that unsecured creditors are able to avail themselves of something in the bankruptcy? So in this case, we're outside of the bankruptcy. The bankruptcy was dismissed. And so we are suing under the Fraudulent Transfer Act just independently of the bankruptcy code. And under the law as we understand it, secured creditors and unsecured creditors can both proceed under the Uniform Fraudulent Transfer Act. The cases that you cite, am I incorrect in remembering that none of those are secured creditors, that they are all unsecured? Your Honor, I can get you that answer on rebuttal. I'm not sure of that. That's not something I was expecting today. And so I can take a look at that. Yes, look, I would like to know if any of those cases, if you have any case for us that involves a secured creditor. And whether they're secured or not, does that have anything to do with whether or not the interest has been perfected? Well, so the – well, I think that there is a security agreement. And the question of the perfection, I believe, goes into the ability of Thermo Credit to enforce that security interest against a third party. In this case, when the assets were transferred, Thermo Credit no longer had any right to enforce under its security agreement. It had no rights in its standing to recover from DCA, which just as any unsecured creditor. So your argument is that the cash was not – any security interest was not perfected in the cash? It was perfected while it was in the hands of Thermo Credit or COI pursuant to the cash collateral order. There was an automatic perfection there. And so we don't have to look to the control or the possession of the cash the way we normally would. But once that money is transferred, the UCC treats money differently than it does other collaterals, such as a car or a home. And upon transfer, it is extinguished as a matter of law. Where do we look? Walk us through the provision of the UCC that tells us that. Sure. So the provisions that we look at, there's two. The first is 1339, 1332, and that says that a transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party. So make a couple points on that about collusion. And that is that the collusion has to be for the specific purpose of violating the rights of the secured party. And then I'd also want to point you to 9312B3, which says that cash may only be perfected by possession. So once released from possession, it is no longer perfected. It is no longer encumbered by that security interest. And so if you have already approved the transfer of that money, why would it be considered a fraudulent transaction? So we did not approve the transfers. There's two periods of time here, pre-petition period and post-petition period. On the pre-petition period, there's no evidence that my client had the opportunity to approve any of the amounts, the obligation to the minimum monthly payments. And when you move into the bankruptcy period, during the period of time that COI was in bankruptcy, the cash collateral orders, that's not an approval of the amount of the value. That's not what secured lenders are looking to or the courts are looking to in entering a cash collateral order. What the courts are looking at is whether there's adequate protection. And that's a different issue. And wasn't there protection for you because Thermo Credit received monies, monthly monies at the same time that these payments were being made? Those were the amounts that it was due under its security agreement with the debtor. And you continued to receive those? Correct, correct. But there was, you know, cash collateral orders are entered very, very early in a bankruptcy case. These are necessary to be ordered in order for the debtor to continue with its business. And purpose of Chapter 11 is for the rehabilitation of the debtor, so it's very important that they're allowed use of cash collateral in situations like this. It was also important to you, right? Sure. Sure. Well, the whole time, the payments that were made, Thermo Credit was aware of those. There's no evidence of their awareness prior to the bankruptcy or when they became aware of those. When was that? When did they become aware? I don't believe that that was established in the record. Well, Thermo Credit had a great deal of supervisory authority or involvement in the affairs of the debtor at all times, correct? No. And my client would say that that is something that he specifically is aware of as a lender because if a lender becomes actively involved in the management of the affairs of its debtor, it can become liable for the debts to third parties as well as to the lender itself. And so that is something that specifically in deposition testimony came out, that that is something that they're specifically aware of. Certainly, if the lender steps into the shoes of the entity to whom it lends and runs its business, then you have a liability problem. But I understood from the record that as a secured creditor that Thermo Credit acted pursuant to its own loan agreement, and that loan agreement authorized them to be provided regular information regarding the use of the funds. Is there a place in the record that would indicate that that's incorrect? Well, I think that they were entitled to regular information about it, but there is nothing in the record that would say that they were allowed to direct the debtor. Well, here we're talking about a fraudulent transfer. So the concern is unbeknownst to Thermo Credit were fraudulent activities involved that took money that should have been part of their security interest and gave it to another. I want to step back for a moment because I don't believe that that is actually what the Uniform Fraudulent Transfer Act protects against. The Uniform Fraudulent Transfer Act is focused on transfers of an insolvent debtor for less than reasonably equivalent value. That's the question that we're looking at here. So your position is that Thermo Credit could know that a transfer was being undertaken routinely, be aware of that going on and aware of how much money it was, and then later come in and say, well, I knew you were doing it, but I thought you would survive or some other reason and still be able to claim that that's a fraudulent transfer? I think the question is whether it's for reasonably equivalent value. And the evidence showed that Thermo Credit was not aware that the services that DCA was providing were worth roughly half of the value that was coming out of COI. And there's a question of... I'm struggling with what's the responsibility of the lender who is aware that the entity to which it is lending is in financial trouble and is making payments in order to survive and continue. Can they turn a blind eye to payments that might encroach on what they would consider their rights? I don't believe that the evidence supports an assertion that they turn a blind eye. In fact, there's evidence, and I can get you the record site on rebuttal, that Seth Block inquired about the value, and he was assured by DCA and the debtor that, no, these transfers, these services are worth what we're paying for them. And it was only towards the end of bankruptcy, once it came to light, that the financial statements that were being provided to the bankruptcy court were, at best, inaccurate, that they realized that there was this discrepancy. If we look at this case down the road as the question of reasonably equivalent value, now, DCA is the moving party here. You have the burden of establishing that there is a genuine issue of material fact with respect to the reasonable equivalence. And for that, you rely on this expert opinion. So ultimately, your fate in this case, if you get past all the other hurdles, depends on whether we think that the evidence from that expert creates a genuine issue of material fact. Is that correct? It's correct, and I notice I have a red light. Can I go ahead and answer your question? Yes. The only evidence, we would argue, in that record that quantifies the value of the services that DCA provided was our expert report. They did not rebut that. They argued that there were services that were not considered, but they did not attempt to quantify those. Well, but before we even get to that, I mean, we're not in a trial situation where we're finding ultimate facts. The question is the sufficiency of your evidence to establish a genuine issue of material fact. It's not about weighing the evidence that DCA might have provided. Correct. I think that's absolutely correct, and I believe the only evidence of the value of those services was the expert report that our expert put together, and that has to create a material fact in our support. You'll have your rebuttal time. May it please the Court, Ryan Wilson for the Appellee DCA Services. Obviously, the panel has dug into this case already, and that's appreciated. So let me hit the highlights. First of all, to one of your earlier points about whether there's ever been a secured creditor successfully prevail on a fraudulent transfer case, that is a point that I have pointed out every step of the way in the briefing in this case. Has there been one whose right to make that claim has been recognized even if the proof failed? No, Your Honor. I haven't found one. I've challenged them to point one out in every brief, and I suppose Sarah can correct us all. But it's a question I've asked, and it's never been pointed out to me. This case becomes a lot simpler if the statute doesn't apply to it in the first place, does it? Well, that's true, and I would submit there are other simple reasons, even if the statute does apply. But that is a threshold question. But it's also logical. I'll tell you this. Even in a case that is a reasonably equivalent value case, as you say way on down the road, the courts say that even in those, the court is, I mean the cases say the courts are admonished to abide by and respect and uphold the reasons for the fraudulent transfer statute in the first place. And in all of those comments, I'll call them holdings, about the purpose of the act, it's as you say. It's to protect unsecured creditors. One of them from Ohio says to protect unsecured creditors from last minute demunition of assets. In this case, as you've already pointed out, is the absolute opposite of that. This is two and a half years of monthly invoice payments. This is not a, I started to say typical fraudulent transfer case. It's certainly not that. I don't think it's a fraudulent transfer case at all, and that's one of the reasons. This is not a secret, you know, behind the scenes, last minute transfer of an asset. Do you have any cases or other authority or Hornbook law that says this is not an act that a secured creditor may avail itself of a remedy from? As you pointed out, Your Honor, the preamble, so to speak, of the statute says that the cases I have stated or cited say that it's to protect unsecured creditors. I've seen no holding in a case that says a secured creditor just as a matter of law can't proceed. I submit because what sort of secured creditor would attempt such a case? I mean, I've never heard of it. I liken it to trying to fit a square peg into a round hole. I mean, it just doesn't fit, and that's why I don't think there's ever been a reported case say what the statute says it's for because it's just never come to that point. I'm unaware of any secured creditor, especially one like this, who knows for two and a half years, and I guess I'll take issue with some of counsel's statements about the level of Thermal Credit's knowledge. The evidence, and it's undisputed evidence, is that from the start to finish of this two and a half years, literally start to finish, Thermal Credit had knowledge of COI's dealings with my client. How did Thermal Credit have that knowledge? Well, the start is from Exhibit 4. I can get you the page ID if you need it, but Exhibit 4 to my summary judgment brief is an e-mail that COI sent to Thermal Credit before the first agreement was ever signed, and it says you guys. The first management agreement. The first management agreement before, and they sent a draft of it to them and said, look, you guys are our secured creditor. Please have a look at this. Review it because, and now I'll quote, because you guys need to be on board with this if we're going to do it. I don't think Thermal Credit's arguing your first management agreement, though, was fraudulent. Are they? I believe they are. I mean, they've attacked every monthly payment. That expert report looks at every payment. The damages they seek would be based on the entire time history? That's what I'm told from the entire time history, and frankly, while I don't think it's appropriate, even more than their ode is what they're seeking in damages according to filed papers. What other evidence do you have besides that e-mail you made? So that's the start of it. The middle of it are things like, as the panel pointed out, the budgets and financial statements that Thermal Credit received on a monthly basis where these payments are disclosed. There are e-mails that are My Summary Judgment exhibits 22 and 23, which are good examples, and they say these are Thermal Credit e-mails, sometimes COI, sometimes internal, that say we have control over COI's cash and we need to keep it that way. The bankruptcy order, the cash collateral order, is sort of in my middle realm, too. I mean, clearly at that time they knew. There are years' worth of monthly payments made after that. Cash collateral order was negotiated by, frankly, a fellow named Marcus Helt, who is the same counsel that represents Thermal Credit in this case from Sarah's firm. He was bankruptcy counsel, and he's counsel in this case, and they negotiated with COI. I mean, among other things, the cash collateral order says the company, COI, would be irreparably harmed if these payments aren't made. And it's not just a lump sum budget attached to the order. Isn't part of the difficulty, or isn't it a problem for your argument, that true facts about the problematic nature of COI's finances did not come out until the fall of 2014? So isn't that part of the argument of Thermal Credit that we did not, while we knew what was going on, you had kept from us the true nature of your finances and we didn't know until the fall of 2014? Sometimes they say that, but before the first management agreement was ever signed, Thermal Credit sent a default notice to COI, that they were in default under this very secured lending arrangement. Their trouble, COI's trouble, is what initiated the involvement of bringing DCA in to try to save them. That's what the Exhibit 4 email was about. When was that, that they sent the default notice? When was it? Yeah, remind me. What year? It was before the first agreement. So early on? Oh, before, before DCA was on board. And what came out in 2014, was there a significant difference between the information that generated a default and what became known to everyone in the fall of 2014? You know, I don't think so in the broad sense. I mean, everyone knew this company was distressed. That's why DCA was brought in, brought on in the first place. COI ended up attempting this Chapter 11 reorganization, never could get traction there, and finally came out of it. Or just gave up, is what happened, and tanked the company. I can get you that. I think I brought the default notice up here. Why don't you proceed with the, we can look at that. Why don't you proceed, because I know we want you to get to reasonably equivalent value. Okay. So let me just briefly say then, so the evidence about my analogy of start to finish. The finish of it is, even in the very end, Thermo Credit was clearly knowledgeable, clearly involved directly with the payments to DCA, so much as is reflected in Exhibit 32 to my motion for summary judgment. Once COI got behind to my client, and by the way, we have a $192,000 uncollectible judgment ourself that's in the record. Once COI got behind to my client, there are emails showing communication between this fellow named Seth Block from Thermo Credit and COI about how to negotiate with my guys. I mean, there are emails they produced. Hey, why don't you offer them $35,000? You think DCA will take that, you know, to give us some more work? I mean, the notion that they didn't know what was going on is just wrong. Exhibit 27, just last point on that. Exhibit 27 is a note from Seth Block of Thermo Credit that tells COI, pay DCA $12,000. That was either the last payment we ever got or the next to the last. And so to say that they weren't involved, and, you know, as again, I'm saying start middle to end, they clearly were. Do you want me to go to reasonably equivalent value now? It's up to you, yeah, but. Well, so let me just say briefly, I think you guys are on the issue. I'll say this. There are two reasons why summary judgment's appropriate before we get to reasonable equivalent value. Three, if you count just secured lenders, as a matter of fact, are entitled. The second is really sort of the definitional reason under the Act about why secured lenders can't recover, and it's the definition of transfer under the Act, which includes the definition of assets. So a transfer must be of an asset, and an asset means property of the debtor, in this case COI, but not to the extent it's encumbered by a lien. And that's what Judge Sargas focused on with respect to the post-payment, post-bankruptcy payments. They're encumbered by the lien. I submit, I'm sure you saw it in the brief, that the same argument applies pre-bankruptcy because of the secured loan arrangement that's in the record. Thermal Credit doesn't dispute that even pre-bankruptcy they were the first priority, first secured creditor of COI and that they had a security interest in all assets. If we assume it is an asset, we assume that the lower court is correct on that, how do you obtain a summary judgment on reasonably equivalent value? Isn't there a dispute of material fact? You have an expert report from Thermal Credit, and then you have no expert report. You have some information from someone who worked for the client regarding indirect benefits. Why is that not just a classic dispute of material fact? Well, on that point, the fellow you referenced that worked for my client is named Jeff Swenson. He worked for DCA for about half of this time, quit his job, moved to Ohio, and took a job with COI. So he became a COI employee because he believed in the company and thought he could turn it around. So he's wearing the hat of COI when he testifies too. And you're right, I couldn't retain an expert attorney to rebut the report, so what I did, I used the source, the guy that was involved, Mr. Swenson. Not only did he testify, but he submitted a written report of his own. Accepting your argument requires two conclusions in your favor, as best I can tell. One is that expert testimony on this point is not required, unless you consider that Mr. Swenson is the equivalent of an expert, but you didn't really attempt to qualify him as such. And two, you've got to establish or to present a convincing argument, I'm not saying establish, as a matter of proof, but you have to prevail on the position that the expert that Thermocredit offered, that his testimony has no tendency or insufficient tendency to prove reasonably equivalent value to establish that what DCA was offering was not reasonably equivalent to the amount paid. And the problem with his report is it was a quote, penny for penny analysis, which all of the courts say is not the way you analyze reasonably equivalent value. For one thing... Could you point us to the best cases that will tell us that? I can. So there's a Southern District of Ohio case called Dayton. Do you need the case site? Well, I mean, Dayton, yes. So it's 292 Bankruptcy 857. I mean, I'm sure my law clerks are right. I'm not sure how to say it, but Gerdes, G-E-R-D-E-S, is 246 Bankruptcy 311. As you know, a lot of these are bankruptcy cases because the statute is similar to the state statute. And one other called, I'll just leave you with this, Congrove. It's a federal APPX case, 222 Sixth Circuit case, APPX 450. And one thing those cases point out is a couple of things. One is, even in that context, you have to look at the purpose of the act, protecting unsecured creditors. I see my time's up. Do you want me to continue my answer? No, I was probably paying insufficient attention to the light. Actually, that's in your interest because it means I was listening and thinking about the substance of the argument. But it does mean you need to sit down. Okay, gladly. Hello. I just want to briefly go back to the question that you posed to me at the beginning of my argument, and that was this question about secured versus unsecured. And first I just want to reaffirm that the UFTA does not require, as an element of the claim, that a creditor prove that they are unsecured. It only requires that they prove that they are a creditor. But even if we did want to add that requirement and say that only an unsecured creditor can pursue a fraudulent transfer claim, here we had a secured claim and an unsecured claim. We were unsecured to the extent that our debt owed by CUI exceeded the value of our collateral. And when we asserted this lawsuit and filed this lawsuit, we were an unsecured creditor at that point. We had foreclosed on our collateral and at that point only held an unsecured claim. I thought you had complete security over all of the assets of the debtor. Right. Our collateral consisted of the assets of the debtor, but that was not sufficient to... But isn't that always what happens in bankruptcy to secured creditors? I mean, you are still a secured creditor. It's just that they don't have enough. Sure. And I think that in bankruptcy that may generally be true. I don't think it's always true that secured creditors are undersecured or that they even have interest in the whole universe of a debtor's property. Do you have any cases where a secured creditor employed the Fraudulent Transfers Act? I can't point you to a specific case where a secured creditor is proceeding like we are here under the UFTA. I don't believe that means that they don't exist. I just don't have them for you today. But what I would point you to is the fact that in a bankruptcy context, if a trustee or a debtor in possession is pursuing a fraudulent transfer claim under 544, certainly there you will have secured creditors that benefit as a result of fraudulent transfers because the trustee is proceeding on behalf of all of the creditors there and the secured creditors would be satisfied first. One more question. Who has the burden of proof to show reasonable equivalent value? I believe that we have the initial burden to prove reasonably equivalent value, and we did that here. We put forth an expert report that showed that the services rendered were not reasonably equivalent to the transfers, but that does not mean that we have to then disprove every other theory that the defendants come up with. When the defendant then puts in evidence, don't we have a dispute of material fact? I would argue that, yes, at best there is a reasonably equivalent fact. I don't believe that they put into evidence competent evidence showing a quantified value that these alleged services provide, and I just want to quickly touch on this as well. The services that the district court relied on were negotiations with a vendor called CenturyLink, and those negotiations were consideration for the original MSA, which did not contain a minimum monthly fee. We appreciate the argument that both of you have given, and we'll consider the case carefully. Thank you. At this point, I want to note that one of the law students present in the room is wearing a hat, and unless there's some medical or other reason that you need to be wearing that, I'm going to ask that you remove it. It may seem that that's a silly rule, but courts are traditional places, and traditional customs of respect are appropriate in a courtroom setting. I mean, we don't allow people to eat or drink or do any of the other things that people might be accustomed to doing if they're in the position of being a spectator to something.